# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JACKIE RAY CEARLEY, )
)
Petitioner, )
)
v. ) 1:09CV397
)
FRANK L. PERRY, )
)
Respondent.[1] )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1.) A jury in the Superior Court of Yadkin County found Petitioner guilty of four counts of assault with a deadly weapon inflicting serious injury, one count of involuntary manslaughter, and one count of felony hit and run in cases 03CRS1543-1548, whereupon the trial court entered judgment sentencing Petitioner to consecutive prison terms of 23 to 37 months, 25 to 39 months, 23 to 37 months, 27 to 42 months, 19 to 23 months, and 8 to 10 months. (Id., ¶¶ 1-6; see also Docket Entry 6-3 at 46-51 (jury verdict forms), 53-64 (judgments).) He pursued but failed to secure relief on direct appeal. State v. Cearley, No. COA04-1172, 172 N.C. App.

---

[1] Consistent with Rule 2(a) of the Rules Governing Section 2254 Cases, the Petition in this case originally named Alvin W. Keller, then-Secretary of the North Carolina Department of Correction ("NCDOC"), as Respondent. (Docket Entry 1 at 1.) Subsequently, NCDOC "became known as the Division of Adult Correction . . . within the [North Carolina] Department of Public Safety [("NCDPS")] . . . ." Turner v. Young, No. 1:08CV884, 2013 WL 2403274, at *1 n.1 (M.D.N.C. May 31, 2013) (unpublished). Frank L. Perry currently serves as Secretary of the NCDPS. See https://www.ncdps.gov (search for Secretary Frank L. Perry) (last performed May 30, 2014). By operation of Federal Rule of Civil Procedure 25(d) (applicable to this proceeding pursuant to Rule 12 of the Rules Governing Section 2254 Cases), Secretary Perry thus now appears as Respondent.

172 (table), 616 S.E.2d 32 (table), 2005 WL 1805026 (Aug. 2, 2005) (unpublished), review denied, 360 N.C. 68, 622 S.E.2d 111 (2005).

The Superior Court thereafter denied Petitioner's Motion for Appropriate Relief ("MAR") and the North Carolina Court of Appeals declined review. (Docket Entry 1, ¶¶ 10, 11; see also Docket Entries 6-10, 6-11, and 6-12 (MAR and amendments filed by counsel for Petitioner); Docket Entries 6-13 & 6-14 (order denying MAR (as amended)); Docket Entry 6-15 (certiorari petition); Docket Entry 6-17 (order denying certiorari).) He then instituted this action. (Docket Entry 1.) Respondent answered (Docket Entry 4) and moved for summary judgment (Docket Entry 5). Petitioner responded (Docket Entries 10, 11) and later sought leave to conduct discovery (Docket Entry 12). He also moved for partial judgment in his favor and prompt action by the Court. (Docket Entries 15, 31, 34.)[2] For the reasons that follow, this Court should deny any habeas relief.

### I. FACTUAL BACKGROUND

The North Carolina Court of Appeals summarized the facts underlying Petitioner's convictions as follows:

> The evidence tends to show that on 1 January 2003, [Petitioner] struck a vehicle driven by Bobby Taylor ("Taylor") at the intersection of U.S. 21 and Rocky Branch Road. Taylor's vehicle contained five additional occupants, Jimmy Yarborough ("Jimmy"), Mary Yarborough

---

[2] Petitioner and/or his sister also filed a number of other motions (Docket Entries 19, 21, 22, 24, 25), which the Court (per the undersigned United States Magistrate Judge) struck (Text Order dated Aug. 1, 2012). Petitioner subsequently filed a Motion for Consolidation of Defenses (Docket Entry 29), objecting to the Text Order striking those motions and seeking to revive them via consolidation with his pending partial summary judgment motion (see id. at 1-2). Because the Petition fails as a matter of law, no basis exists to reinstate the stricken motions; however, the Clerk should refer Petitioner's instant Motion for Consolidation of Defenses to the assigned United States District Judge for disposition of the objection(s) to the Text Order in question.

("Mary"), Kimberly Yarborough ("Kimberly"), Luke Collins ("Luke"), and Kathy Taylor ("Kathy"). Kimberly, Luke, and Kathy were thrown from the vehicle and injured due to the collision. Jimmy also sustained injuries. Mary was fatally injured in the collision and died shortly thereafter.

At trial, Bradley Oliver ("Bradley") testified that he and his wife, Angela Oliver ("Angela"), were traveling approximately three to four car lengths behind Taylor's vehicle and witnessed the collision. Bradley testified that [Petitioner] was traveling at "the speed limit [i.e., fifty-five miles per hour] or pretty fast", and Angela testified [Petitioner] appeared to be traveling approximately sixty miles per hour. Both agreed [Petitioner] did not slow in any way when approaching the intersection. Following the collision, Angela testified she observed [Petitioner] run past the bodies lying in the road and away from the scene of the accident.

[Petitioner] went to a home a few miles from the intersection, where he requested a ride from Frank Fleming ("Fleming"), the owner of the home. [Petitioner] explained to Fleming that he had been in an automobile accident. Although Fleming did not know [Petitioner], he agreed to take him to his mother's home. [Petitioner] told Fleming he was not the driver of the automobile. When they approached the collision site, Fleming testified that [Petitioner] became nervous. As a result, Fleming pulled over past the collision site and refused to take [Petitioner] further. [Petitioner] was then taken back to the accident scene by Fleming at [Petitioner's] request.

Upon returning to the scene, [Petitioner] told the investigating trooper that he had been riding in the vehicle which had struck Taylor's car, but that the driver was Edward Beamer ("Beamer"). Beamer was charged with failure to stop at a stop sign, misdemeanor death by motor vehicle, and felony hit and run. An investigation revealed that Beamer was in another town at the time of the collision. Beamer was not indicted by the grand jury.

On 5 June 2003, [Petitioner] admitted that he, rather than Beamer, was the driver of the truck which hit Taylor's vehicle. [Petitioner] made a written statement to police, stating that: "When I approached the intersection it was not clearly marked. It seemed as though I was traveling on a straight highway. I never seen [sic] the intersection when I approached it. A

green Mustang came through the intersection and my truck struck the Mustang."

[Petitioner] was indicted on four counts of felonious assault with a deadly weapon inflicting serious injury, one count of involuntary manslaughter, and one count of felony hit and run.

Evidence was offered at trial as to the intersection where the collision occurred. Trooper Roger Smock ("Trooper Smock"), a specialist in accident reconstruction, testified that the site was a four-way intersection, with U.S. 21, the dominant road, being the north-south route, and Rocky Branch Road, the servient road, being the east-west route. The configuration of the road was changed in 2001, when U.S. 21 was widened and became the dominant highway. Prior to 2001, Rocky Branch Road had been a dominant highway with no stop signs. Trooper Smock stated that the posted speed limit on Rocky Branch Road was fifty-five miles per hour. A "stop ahead" sign was located on the shoulder of Rocky Branch Road, 962 feet prior to the intersection. Trooper Smock testified that two series of multiple rumble strips, defined as hard durable raised plastic strips placed in the roadway to alert a driver "there may be something ahead to be aware of," were located on Rocky Branch Road approaching the intersection. Trooper Smock further stated that the first set of rumble strips were located 674 feet before the intersection, and the second set of fourteen rumble strips were located 457 feet before the intersection. Finally, a standard sized stop sign and a second stop sign, "substantially larger in size and higher in elevation," were alongside each other and close to the actual intersection. Trooper Smock testified that all of these devices were in place prior to 1 January 2003.

Cearley, 2005 WL 1805026, at *1-2 (internal brackets and ellipses omitted).

## II.  PETITIONER'S CLAIMS

The Petition identifies three separate grounds for relief. (Docket Entry 1, ¶ 12.)  Ground One, entitled "Ineffective Assistance of Trial Counsel," complains that Petitioner's trial counsel:

1) "decided on a trial strategy of not presenting any witnesses or evidence . . . , despite the existence of favorable and exculpatory evidence made known to [him] in the accident investigation report of State Trooper Jerry Mathis" (id., ¶ 12(Ground One)(a));[3]

2) "fail[ed] to prepare and present evidence, including expert witness testimony, regarding the inherently dangerous nature of the intersection where the accident occurred" (id. (Continuation Page Six));

3) "fail[ed] to procure and call an expert [sic] accident reconstruction expert to testify regarding the forensic evidence indicating that the headlights of the vehicle in which the victims were traveling were turned off at the time of the collision" (id. (Continuation Page Seven));

4) "fail[ed] to request a jury instruction on the lesser included offense of misdemeanor assault with a deadly weapon as to two (2) of the victims" (id. (Continuation Page Eight));

5) "fail[ed] to object to the improper testimony of [Ms.] Oliver regarding Petitioner's thoughts or intent while driving his vehicle at the time of the accident" (id. (Continuation Page Ten)); and

6) "fail[ed] to adequately prepare and present mitigating evidence at sentencing" (id. (Continuation Page Eleven)).

---

[3] Petitioner inconsistently uses capital and lower-case letters. (See, e.g., Docket Entry 1, ¶ 12(Ground One)(a).) For ease of reading, this Memorandum Opinion employs standard capitalization conventions when quoting his filings.

Ground Two of the Petition, which bears the title "Ineffective Assistance of Appellate Counsel on Direct Appeal," presents two claims:  1) appellate counsel "fail[ed] to raise and argue on direct appeal the trial court's error of sustaining the prosecutor's objection to [Petitioner's trial] counsel's question of Trooper Smock regarding the dangerous nature of the intersection and whether he was aware of previous accidents" (id., ¶ 12(Ground Two)(a)); and 2) appellate counsel "fail[ed] to raise and argue the trial court's error in overruling Petitioner's trial counsel's objection to [Ms.] Oliver's lay opinion as to the speed of Petitioner's vehicle" (id. (Continuation Page Twelve)).  Finally, beneath the title "Conviction Obtained upon Insufficient Evidence," the Petition's Ground Three states:  "there was insufficient evidence presented to prove culpable negligence to convict Petitioner of involuntary manslaughter and the four counts of assault with a deadly weapon inflicting serious injury."  (Id., ¶ 12(Ground Three)(a).)[4]

### III.  HABEAS STANDARDS

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Further, "[b]efore [the] [C]ourt may grant

---

[4] To the extent Petitioner's Brief opposing Respondent's summary judgment motion discusses matters omitted from the Petition, he has not properly presented such matters for adjudication.  White v. Keller, No. 1:10CV841, 2013 WL 791008, at *3 (M.D.N.C. Mar. 4, 2013) (unpublished) (Schroeder, J.) (citing cases).

-6-

habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to [this] [C]ourt in a habeas petition. The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").

When a petitioner has exhausted state remedies, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves

-7-

an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409-11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous"). Finally, this Court must presume state court findings of fact correct unless clear and convincing evidence rebuts them. 28 U.S.C. § 2254(e)(1).

## IV. DISCUSSION

### A. Ineffective Assistance of Trial Counsel

When assessing Petitioner's first ground for relief, the Court first should take note that:

> In order to establish an ineffective assistance of counsel claim . . ., [a petitioner must] establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," [Strickland v. Washington, 466 U.S. 668, 688 (1984)], and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "Unless a [petitioner] makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

> In determining whether counsel's performance was deficient, "[i]t is all too tempting for a [petitioner] to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted).

> Similarly, in evaluating whether [a petitioner] has shown actual prejudice from any such deficient performance, it is insufficient for the [petitioner] "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." Id. at 693. Rather, a "reasonable probability" that the result would have been different requires "a probability sufficient to undermine confidence in the outcome." Id. at 694. When challenging a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

Fisher v. Lee, 215 F.3d 438, 446-47 (4th Cir. 2000) (internal parallel citations omitted).

"Surmounting Strickland's high bar is never an easy task. . . . Even under de novo review, the standard for judging counsel's representation is a most deferential one." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 788 (2011) (internal quotation marks omitted). Moreover, "[w]here the issue is whether the state court has unreasonably applied Strickland standards to a claim of ineffective assistance of counsel, . . . double deference is required . . . ." Lavandera–Hernandez v. Terrell, No. 1:12–cv–553, 2013 WL 1314721, at *4 (M.D.N.C. Mar. 28, 2013) (Schroeder, J.) (unpublished) (internal quotation marks omitted), appeal dismissed, 539 F. App'x 159 (4th Cir. 2013); see also Harrington, ___ U.S. at ___, 131 S. Ct. at 788 ("The standards created by Strickland and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." (internal citations and quotation marks omitted)). Accordingly, when the Court's examination of an ineffective assistance claim proceeds under Section 2254(d), "[t]he question is whether there is any

reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, ___ U.S. at ___, 131 S. Ct. at 788; see also Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011) (observing that Section 2254(d) imposes "a difficult to meet and highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt . . . [and that a] petitioner carries the burden of proof" (internal citations and quotation marks omitted)). In other words, "under the dual, overlapping lenses of [Section 2254(d)] and Strickland [the Court must] ask[] the following question: Was the MAR court's holding incorrect to a degree that its conclusion was so lacking in justification that it was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" Moore v. Hardee, 723 F.3d 488, 496 (4th Cir. 2013) (internal brackets, ellipses, and quotation marks omitted).

## 1.  Failure to Call Trooper Mathis

Ground One of the Petition first alleges that trial counsel provided ineffective assistance by not calling Trooper Mathis "as a witness in the trial to testify regarding his observations and investigation of the accident and other testimony which would have been helpful to the defense . . . ."  (Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Page Five).)  In that regard, the Petition focuses on what it describes as Trooper Mathis's "testimony at Petitioner's hearing on his [MAR] that this accident was no different than any other accident where a motorist had overrun an intersection, that there had been numerous accidents at this

intersection prior to Petitioner's accident, that [Trooper Mathis] and other troopers in the county had had discussions of the dangerousness of this intersection and that they were of the belief that it was only a matter of time before someone would get killed at this intersection." (Id.) Trooper Mathis "investigate[d] [the] accident scene . . . involving [Petitioner] on January 1, 2003[.]" (MAR Hrg. Tr. 176.)[5]  In Spring 2003, Trooper Smock and Trooper Craig Caudill, specially-trained accident reconstruction investigators, received assignment to the case and obtained information from Trooper Mathis.  (Trial Tr. I 31-32, 57-58, 60, 78-79, 82; Trial Tr. II 25-26, 28, 41-42; MAR Hrg. Tr. 182-83, 190, 192, 196-98, 202.)  Trooper Mathis retired on June 30, 2003 (MAR Hrg. Tr. 179) and did not testify at Petitioner's trial (MAR Hrg. Tr. 183; see also Trial Tr. I 2; Trial Tr. II 2; Trial Tr. III 2).

At the MAR hearing, Trooper Mathis testified he interacted with Petitioner at the accident scene for "a good 15, 20 minutes, at least" and formed the opinion that Petitioner "had not in any form or fashion touched alcohol, any kind of drugs that [he] could tell."  (MAR Hrg. Tr. 177.)  Trooper Mathis further averred "that there was not a great amount of speed involved in this collision. This was no different than numerous other accidents [he] had investigated through the years of a -- what you would call sliding

---

[5] Respondent "manually filed the three-volume transcript of Petitioner['s] state-court criminal proceeding and the three-volume transcript of [his] state-court [MAR] evidentiary hearing."  (Docket Entry 7 at 1.)  Although the transcript of the MAR hearing appears in three volumes, its pagination continues uninterrupted from the first volume through the third volume; however, each volume of the trial transcript bears independent pagination.  Accordingly, citations to the latter refer to a volume, but citations to the former do not.

through an intersection and T-boning someone when they went by."
(MAR Hrg. Tr. 180.)  Finally, when asked if he knew "about other
accidents at this intersection," Trooper Mathis responded:  "I knew
we had had numerous accidents prior to this accident, and we had
even talked, as troopers in the county, that we knew it was just
going to be a matter of time, somebody was going to get killed in
this intersection."  (Id.; see also MAR Hrg. Tr. 181 ("Q. How many
other accidents were you aware of?  A. At least three or four.").)

Respondent argues that this claim fails due to procedural bar
because Petitioner did not raise it in his MAR (as amended) and
state law would preclude him from doing so at this juncture.
(Docket Entry 6 at 9-10.)  A careful review of the argument
portions of Petitioner's MAR and amendments thereto confirms that
he did not fairly present to the state court an ineffective
assistance claim predicated on trial counsel's failure to call
Trooper Mathis as a witness.  (See Docket Entry 6-10 at 21-46;
Docket Entry 6-11 at 2-5; Docket Entry 6-12 at 2-3.)  Nor do the
legal conclusions set forth in the order denying the MAR (as
amended) indicate that the MAR court deemed Petitioner to have
articulated such a claim.  (See Docket Entry 6-14 at 1-45.)[6]

Under these circumstances, a procedural bar applies to this
particular ineffective assistance of counsel claim.  See Rose v.

---

[6] Petitioner's Response to Respondent's summary judgment motion asserts
that the MAR court "ruled upon this claim in its order denying Petitioner's MAR,
at page 54-58."  (Docket Entry 10 at 2.)  Examination of those pages of that
order reveals that the MAR court therein addressed Petitioner's claim that trial
counsel provided ineffective assistance by failing to call an expert witness like
Don Moore, P.E., not any claim that trial counsel should have called Trooper
Mathis to solicit the cited testimony.  (See Docket Entry 6-14 at 1-5.)

Lee, 252 F.3d 676, 683 (4th Cir. 2001) (discussing mandatory nature of procedural bar under N.C. Gen. Stat. § 15A-1419, which applies to collateral claims regarding matters the petitioner could have raised previously); Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998) (quoting Coleman v. Thompson, 501 U.S. 722, 735 n. 1 (1991), for proposition that "procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred'"). In light of that procedural bar, Petitioner must demonstrate either that cause for and prejudice from his procedural default exists or that the refusal to address the defaulted claim will result in a miscarriage of justice. Longworth v. Ozmint, 377 F.3d 437, 447-48 (4th Cir. 2004). Petitioner has made no argument on these points (see Docket Entry 10 at 1-3; Docket Entry 11 at 3-16) and no basis adequate to excuse his default appears evident in the record. Accordingly, the Court should rule this claim procedurally barred.

## 2. Failure to Present Evidence of Intersection's Dangerousness

The second ineffective assistance claim included in Ground One alleges that "trial counsel . . . fail[ed] to prepare and present evidence, including expert witness testimony, regarding the inherently dangerous nature of the intersection where the accident occurred . . . ." (Docket Entry 1, ¶ 12(Ground One)(a)

(Continuation Page Six).)[7]  Notwithstanding the general reference
to "expert witness testimony" in the description of this claim, the
related "Supporting Facts" section makes <u>no</u> reference to <u>any</u> expert
witness testimony Petitioner's trial counsel purportedly should
have presented about any dangers posed by the intersection.  (<u>See</u>
<u>id.</u> (Continuation Pages Six and Seven).)  Instead, in terms of
specifics, this claim identifies only the failure of trial counsel
to gather documentation "pertaining to the <u>number of accidents</u> that
had previously occurred at the intersection" and the fact that
trial counsel "spoke with local sheriff's deputies and highway
patrolmen about the dangerousness of the intersection, but . . .
did not call any witnesses or put on any evidence at trial as to
the <u>high number of accidents</u> at that particular intersection
[because] he would lose his right to have the last argument to the
jury and he considered that important."  (<u>Id.</u> (emphasis added).)

Given these considerations, any portion of the instant claim
that asserts trial counsel provided ineffective assistance by
failing to gather and to present evidence (including expert
testimony) about the subject intersection <u>other than</u> as to the
<u>number of accidents</u> there fails as entirely conclusory.  <u>See, e.g.,</u>
<u>Powell v. Shanahan</u>, No. 3:13CV496FDW, 2014 WL 1464397, at *8
(W.D.N.C. Apr. 15, 2014) (unpublished) ("[T]o the extent [the]

---

[7] Petitioner's filings in opposition to Respondent's summary judgment
motion do not defend the viability of this claim.  (<u>See</u> Docket Entries 10, 11.)
However, "in considering a motion for summary judgment, the [Court] 'must review
the motion, even if unopposed, and determine from what it has before it whether
the moving party is entitled to summary judgment as a matter of law.'" <u>Robinson</u>
<u>v. Wix Filtration Corp. LLC</u>, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (quoting
<u>Custer v. Pan Am. Life Ins. Co.</u>, 12 F.3d 410, 416 (4th Cir. 1993)).

[p]etitioner bases his ineffective assistance of counsel claim on his attorney's alleged failure to investigate, [he] has presented . . . unsupported and conclusory allegations, which are insufficient to warrant either an evidentiary hearing or habeas relief." (citing <u>Nickerson v. Lee</u>, 971 F.2d 1125, 1136 (4th Cir. 1992))); <u>Talbert v. Clarke</u>, No. 2:13CV199, 2014 WL 644393, at *16 (E.D. Va. Feb. 18, 2014) (unpublished) ("The petition fails to comply with the requirement of Rule 2(c) of the Rules Governing Section 2254 Cases in District Courts that the [p]etitioner 'state the facts supporting each ground.' Rule 2(c) is more demanding than the notice pleading requirement of Fed. R. Civ. P. 8(a). <u>Mayle v. Felix</u>, 545 U.S. 644, 655 (2005). '[I]n order to substantially comply with the Section 2254 Rule 2(c), a petitioner must state specific, particularized facts which entitle him or her to habeas corpus relief for each ground specified. These facts must consist of sufficient detail to enable the court to determine, from the face of the petition alone, whether the petition merits further habeas corpus review.' <u>Bullard v. Chavis</u>, 153 F.3d 719, 1998 WL 480727, *2 (4th Cir. Aug. 6, 1998) (unpublished table decision) (quoting <u>Adams v. Armontrout</u>, 897 F.2d 332, 333 (8th Cir. 1990))."); <u>Rice v. Cooper</u>, No. 3:12CV7RJC, 2012 WL 4321320, at *10 (W.D.N.C. Sept. 20, 2012) (unpublished) ("In Ground 6, [the] [p]etitioner contends that his trial attorney did not want to spend limited state resources to hire an expert to testify about scientific evidence that would clear [him] . . . . [He] is not entitled to relief on Ground 6. First, Ground 6 is wholly

conclusory and unsupported.  That is, [the] [p]etitioner does not explain what evidence an expert would have testified about that would have exculpated [him] . . . ." (internal brackets and quotation marks omitted) (citing <u>Nickerson</u>, 971 F.2d at 1136)).[8]

To the extent the instant claim asserts that trial counsel provided ineffective assistance by failing to secure records and/or to offer witness testimony about the number of accidents at the subject intersection, it does not suffer from the same degree of vagueness that defeated the remainder of the claim, but still falls short as a matter of law.  First, the Petition does not allege what any admissible records might show (or what any witness competently might say) about the number of accidents at the intersection.  (<u>See</u> Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Pages Six and Seven).)  Second, the Petition does not allege what competent testimony a witness (presumably an expert) could have offered as to what any particular number of accidents  proved about the intersection's dangerousness.  (<u>See</u> <u>id.</u>)  Third, Petitioner's filings in response to Respondent's summary judgment motion do not address these issues.  (<u>See</u> Docket Entries 10, 11.)[9]

---

[8] Because (other than referring to accident numbers) this claim does not specify what evidence trial counsel should have obtained and introduced regarding the intersection, the Court reasonably could not determine whether Petitioner properly exhausted any other aspect of this claim.  In other words, if the Court cannot tell exactly what claim Petitioner now purports to assert, the Court cannot determine if he fairly presented it to the state courts.  Fortunately, the Court need not try, as "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

[9] As noted in the prior subsection, in connection with a different allegation of ineffective assistance, the Petition does refer to the testimony by Trooper Mathis at Petitioner's MAR hearing that he had some form of knowledge
(continued...)

Those defects preclude habeas relief in this context, as now-retired United States Magistrate Judge P. Trevor Sharp well-explained when faced with a like situation:

> [The] [p]etitioner claims also that trial counsel failed to have the decedent's pockets and hands checked for powder residue . . . and failed to employ a crime-scene expert. . . . [The] [p]etitioner has failed to show . . . how he was prejudiced by the alleged failure of counsel; that is, he has failed to show what materially helpful evidence or testimony would have been uncovered had trial counsel taken the actions [the] [p]etitioner now says they should have. Accordingly, all of [his] claims of ineffective assistance of trial counsel are conclusory and speculative and do not support a claim for relief . . . .

Broadnax v. Bullock, No. 1:06CV696, 2008 WL 762255, at *9 (M.D.N.C. Mar. 19, 2008) (unpublished) (citing Nickerson, 971 F.2d at 1136); see also Davis v. Clarke, No. 3:13CV119, 2014 WL 693536, at *4 (E.D. Va. Feb. 21, 2014) (unpublished) ("Where a petitioner faults counsel for not calling a witness, the petitioner must provide 'concrete evidence of what the witness would have testified to in exculpation,' so that the reviewing court can adequately assess the significance of the decision not to call the witness." (internal brackets omitted) (quoting United States v. Terry, 366 F.3d 312,

---

[9](...continued)
of "three or four" accidents at the subject intersection, but that testimony neither identifies any basis for such knowledge nor a foundation for any characterization of that number as "high." (See MAR Hrg. Tr. 180-81.) Moreover, at the MAR hearing, Petitioner's expert acknowledged he had no accurate accounting of accidents at the intersection. (MAR Hrg. Tr. 330-31.) Further, when asked if he "form[ed] an opinion as to whether or not this intersection was dangerous," said expert stated: "[A]ll intersections are dangerous. . . . [T]here may be some that are -- are more hazardous than others. This one, I think, has the potential, but -- to be more hazardous. But to do an actual analysis, I would need some information that was discussed yesterday." (MAR Hrg. Tr. 293.) Accordingly, even going beyond Petitioner's filings in this Court and looking at the entire post-conviction record, he has failed to make any showing as to the number of accidents that occurred at the intersection or what, if any, particular number would permit a reasonable inference of dangerousness.

316 (4th Cir. 2004))).  The Court similarly should grant summary

judgment for Respondent on Petitioner's instant claim.[10]

### 3.   Failure to Offer Expert Testimony on Headlights

For its third ineffectiveness claim, Ground One of the

Petition relies on the allegation that trial counsel "fail[ed] to

procure and call an expert [sic] accident reconstruction expert to

testify regarding the forensic evidence indicating that the

headlights of the vehicle in which the victims were traveling were

turned off at the time of the collision."  (Docket Entry 1,

¶ 12(Ground One)(a) (Continuation Page Seven).)  As support for

said claim, the Petition declares:

> Prior to trial Petitioner told [trial] counsel that he
> did not believe that at the time of collision that the
> [victims'] vehicle] had its headlights on.  The state
> highway patrol's lamp examination of the right rear tail-
> light bulb of [the victims' vehicle] revealed cold shock.
> Cold shock is indicative of a bulb filament that was not
> incandescent at the time of impact.  In lay terms, cold
> shock indicates that at the time of the accident the
> tail-light was not burning, which would also indicate
> that the headlights were not burning at the time of
> impact.  Counsel failed to procure and call an accident
> reconstruction expert to testify regarding these facts.

(Id. (Continuation Pages Seven-Eight) (emphasis added).)

The accident reconstruction report prepared by Troopers Smock

and Caudill (attached by Petitioner to his Response to Respondent's

summary judgment motion) states that "[t]he right tail lamp lenses

[of the victims' vehicle] were missing.  A lamp examination of the

---

[10] A close reading of the argument portions of Petitioner's MAR (as
amended) indicates he did not fairly present a claim that trial counsel gave
ineffective assistance by failing to gather or to offer evidence regarding the
number of accidents at the intersection. (See Docket Entry 6-10 at 21-46; Docket
Entry 6-11 at 2-5; Docket Entry 6-12 at 2-3.)  The Court, however, may deny this
claim on the merits despite that lack of exhaustion.  See 28 U.S.C. § 2254(b)(2).

-18-

right rear taillight bulb displayed 'cold shock,' indicative of a filament that was not incandescent. The right brake light bulb was missing." (Docket Entry 10-1 at 22 (emphasis added).) At Petitioner's trial, Trooper Smock testified on direct that said report reflected the following as to the victims' vehicle:

> The right tail lamp lenses were missing, and I did a lamp examination of the bulb within that tail lamp assembly, and during my examination, I concluded that the bulb filament had experienced 'cold shock.' That indicates there was no heat to that element at the time that it experienced a shock or a force strong enough to displace the element within the bulb from its mount.

(Trial Tr. I 51 (emphasis added).) Later, during Trooper Smock's redirect examination, this colloquy occurred:

> Q. Now, with regards to your brake lights on page 22 [of] the accident reconstruction report], you talk a little about the cold shock indicative of a filament that was not incandescent. What are you trying to say there, Trooper Smock, with regards to the brake lights at the time of the accident?
>
> A. It indicates that the -- it was not hot -- cold shock, and a filament inside a light bulb or a standard incandescent light bulb or a bulb in a vehicle has tungsten which is coiled and then comes to the electrode and if it is not hot and experiences a movement lateral or vertical it will be stretched because it is hot and pliable. When it is cold, there is no heat to it, and it is more of a breaking-type action so it will remain coiled evenly and break off the electrodes.
>
> Q. So in other words, is that a way of saying at the time of the accident, the driver of the [victims' vehicle] did not have his brakes on?
>
> A. Yes, sir.
>
> Q. But it doesn't say anything about the headlights?
>
> A. No, sir.

(Trial Tr. I 85-86 (emphasis added).)

In his MAR, Petitioner asserted that "[t]here [wa]s new evidence . . . that would have had a direct and material bearing on the issue of whether [Petitioner] was guilty of culpable negligence . . . , which [Petitioner's] trial counsel negligently failed to procure and present at the trial [as shown] in the attached affidavit of Don Moore, P.E., an expert in accident reconstruction and analysis. . . ." (Docket Entry 6-10 at 23; see also id. at 21 ("The primary issue in the trial of this case was whether [Petitioner's] conduct in driving his vehicle on the night in question rose to the level of 'culpable negligence,' such that he could be properly convicted of the charges of involuntary manslaughter and assault with a deadly weapon inflicting serious injury.").) According to the MAR, "Mr. Moore's affidavit[] proves that [Petitioner] could have been keeping a proper lookout for approaching vehicles and still would not have been able to see the [victims' vehicle] because . . . the credible scientific evidence indicates that the headlights of [the victims' vehicle] were 'off' as it approached the intersection and at the time of impact with [Petitioner's] truck[.]" (Id. at 26.)

More specifically, the MAR states:

> As Mr. Moore indicates in his affidavit, "the trial testimony of Trooper Smock which indicated that the analysis of the bulb and the finding of 'cold shock' merely indicated that the brakes were not being applied at the time of the collision is, in my opinion, incorrect." Mr. Moore goes on to state in his affidavit that, based on his review of [the] Highway Patrol reconstruction report [by Troopers Smock and Caudill], the headlights of the [victims' vehicle] were not on at the time of the collision[.]

(<u>Id.</u> at 27 (internal brackets and citation omitted) (emphasis added).) Finally, the MAR asserts that such "evidence, as shown in Mr. Moore's affidavit, could have been procured by [Petitioner's] trial counsel through the exercise of reasonable diligence. . . . [T]rial counsel was ineffective in failing to investigate, procure and present the foregoing pivotal evidence." (<u>Id.</u> at 28-29.)

At the MAR hearing, the following exchange occurred between Petitioner's MAR counsel and Trooper Smock:

Q.   And did you examine <u>the back lights</u>, the lights that were on the back of the [victims' vehicle]?

A.   Yes, sir.

Q.   <u>At least one of them</u>?

A.   I did.

.  .  .  .

Q.   You did an examination of <u>the bulb</u> in the back of the car; right?

A.   I did.

.  .  .  .

Q.   An examination to see if <u>it</u> had cold shock or hot shock; correct, of <u>some bulb</u> in the back of the car?

A.   Exactly.

.  .  .  .

Q.   What are you trying to find out, sir, when you do an examination -- which is by the words you used -- examination of <u>the bulb</u>?  What are you examining <u>it</u> for and what is <u>it</u> supposed to tell you?  What are you trying to find out?

A.   If the light was on or off.

Q.   And why is that relevant to your investigation here?

A.   Whether or not the lights were working on the vehicle.

. . . .

Q.   Why is the hot shock or cold shock relevant to your investigation?

A.   It really wasn't at this point.  I had already spoken with Ms. Oliver [an eye-witness to the collision and] Mr. Taylor [the driver of the victims' vehicle], and knew that the lights were on.  That's --

Q.   Well, then why did you need to do a physical examination if you are just going to take their word for it?

A.   Examining a vehicle just as I would the scene or talk to a potential witness.  I mean, it's just a part of the investigative process.

Q.   To find out if the physical evidence supports what the witnesses have said?  Isn't that part of what you do?

A.   Yes, sir.

. . . .

Q.   Well, <u>Mr. Taylor said that he had -- he was riding with his headlights on</u> --

A.   <u>Yes, sir</u>.

Q.   -- <u>at the time of impact, and he cut them off afterwards; correct?</u>

A.   <u>He did.</u>

Q.   Okay.  <u>But your physical findings -- your physical examination of the vehicle that he was driving . . . indicated that his headlights were actually off at the time of the collision, didn't it?</u>

A.   <u>It did not.  No, sir.</u>

Q.   <u>Well, it indicated cold shock, didn't it?</u>

A.   <u>It indicated that the two bulbs that I examined that remained -- that survived the crash indicated cold shock. Those two bulbs weren't tied in or related to -- and the headlight operation.</u>

. . . .

Q.    Okay.  So you would agree . . . that the taillights
and the headlights are connected?  When the switch goes
on, they both come on?  You cut the headlights on, the
taillights are going to come on?

A.    Yes, sir.

Q.    And if the taillights are off, then the headlights
are going to be off; correct?

A.    Yes, sir.

Q.    And cold shock, isn't it true, indicates that a
light -- a bulb is not on, to use laymen's terms;
correct?

A.    Yes.  Very, very laymen terms . . . .  That's good.
Laymen's terms, yes.

Q.    I mean, if you would rather use other terms, go
ahead.  I'm just trying to make --

A.    No, because . . . I noticed earlier when we were
talking about this that I had . . . [u]sed some laymen's
terms that were --

Q.    Well, I'll get to that, your report.  I mean, I'm
just asking questions right now.

          THE COURT: You may finish your answer if you
feel like you need to.

A.    Yeah, I had noticed earlier that I had used laymen's
terms that misrepresented the type of light I was -- had
found the cold shock in.  The cold shock actually came in
the back-up lamp and the turn lamp because this is a turn
lamp turning -- of taillight assembly with a number of
bulbs in it that do a number of different functions.  The
two that survived, as I noted and have in my notes from
the examination that day --

Q.    So now you are saying --

A.    The two bulbs that survived --

Q.    Sorry.  Go ahead.

A.    -- experienced cold shock, and I noted that in my
notes but mislabeled it here in an effort to keep from

-23-

going down a road that I knew wouldn't be -- would get very technical. If lighting was an issue, we would do a special topic.

Q.   Well, let's get technical for a minute.  Okay?  Can we do that?  Technical about the taillight assembly?

A.   Yes, sir.

Q.   Okay.  So there is - - there is a dual filament bulb, correct, that contains the brake light and a running lamp; correct?

A.   Correct, and --

Q.   That's contained in one bulb --

A.   Yes.

Q.   . . . . Then there is a side-marker lamp; correct?

A.   Correct.

Q.   And that's one bulb, single filament; correct?

A.   Single filament.

Q.   And then there is a reverse, back-up light, which is one single filament bulb?

A.   Yes, sir.

Q.   Okay.  And then there is a turn signal bulb; correct?

A.   It's an amber bulb with a single filament, yes, sir.

. . . .

Q.   . . . . [Y]ou are saying now that you didn't -- even though you said in your report that it was a taillight, you're now saying it was a back-up light?

A.   It was the back-up light and the turn light -- turn signal lamp.

Q.   What does your report say that you analyzed that found cold shock?

A.   On Page 22 of my report, . . . [a] lamp examination of the right rear taillight bulb displayed cold shock,

indicative of a filament that was not incandescent.  The
<u>right brake light bulb was missing</u>.

. . . .

Q.  Well, let me ask you this.  <u>The brake light was
missing, wasn't it?  The brake lamp was missing?</u>

A.  <u>It was destroyed.</u>  Yeah, the socket for it was
destroyed.

Q.  So you did not analyze that in any way, shape, or
form, did you, for cold shock?

A.  No, I did not.

Q.  Okay

A.  I couldn't.  It wasn't there.

Q.  It wasn't there?  It was missing; right?  So why is
it that at the trial you told the jury that you did
analyze the brake light and that the only reason that it
indicated cold shock is because the brakes weren't being
applied?   Why did you tell the jury that at
[Petitioner's] trial if you, in fact, analyzed the
reverse light now, as you say?

A.  Well, <u>I did analyze the reverse light</u>.

Q.  Okay.

A.  I did make a statement at trial that I analyzed the
bulbs in that tail lamp assembly referring to the bulbs
that survived the impact.

Q.  Isn't it true that you led this jury to believe, in
answer to [the prosecutor's] questions to you, that you
had analyzed a brake light and that the only reason that
it was cold shock had nothing to do with the headlights
but only because the brakes weren't being applied?
Didn't you testify under oath in front of the jury to
that effect?

A.  <u>[The prosecutor] characterized in redirect to me
that - - and called it a brake light.</u>  And just before
that he was asking about cold shock.  And rather than - -
I really felt at that time that his focus was on, what
does cold shock mean?  We had just spoken about it.  A
few minutes later - - 10, 20 minutes later we come back
to it as an explanation.  That was my focus.  <u>I erred in</u>

not correcting him to say the brake light wasn't able to be examined, with my focus being he wanted a more clear explanation of what cold shock really is, and I gave a three- or four-sentence description of what cold shock is and erred without correcting him that there wasn't a brake light, as I just said earlier on Page 22, that the brake lamp was missing because it was destroyed, and there are pictures to support that.

. . . .

Q.   So your examination of the tail lamp had nothing to do with the brakes; is that correct?

A.   Had nothing to do with the brakes?

Q.   The brakes.

A.   Yes, sir.  Correct. . . .

Q.   But . . . [y]ou're saying now that you analyzed -- examined the back-up lamp, which is only on when you're in reverse; correct?

A.   Should be, correct.

Q.   And the turn signal, which is only on when you have got the turn indicator on; correct?

A.   Correct.

(MAR Hrg. Tr. 210-23 (emphasis added).)

Subsequently, on cross-examination, Trooper Smock demonstrated, using a photograph from his accident reconstruction report, that (consistent with his above-quoted MAR hearing, direct examination testimony) the bulbs that survived and that he examined from the right rear of the victims' vehicle belonged to the reverse light and the turn-signal (which he considered taillights, but which did not have a connection to the headlights).  (MAR Hrg. Tr. 233-40.)  After witnessing Trooper Smock's MAR hearing testimony, Mr. Moore (Petitioner's expert) acknowledged that the opinion he

had offered previously (on which Petitioner's MAR relied (see Docket Entry 6-10 at 26)), i.e., that Trooper Smock's "cold shock" findings indicated the victims' vehicle had its headlights off at the time of the collision, arose from an incorrect assumption about which bulb(s) Trooper Smock actually scrutinized. (See MAR Hrg. Tr. 344-50.) Moreover, Mr. Moore agreed that "the bulbs [Trooper Smock] [wa]s looking at is [sic] not bulbs that are going to tell you whether the headlights are on or off. They have no -- no relationship to the headlights." (MAR Hrg. Tr. 348.)

The MAR court thereafter denied, pursuant to both the performance and prejudice prongs of Strickland, Petitioner's above-referenced claim that his trial counsel provided ineffective assistance by failing to call an expert to testify about whether evidence gathered by Trooper Smock indicated the headlights of the victims' vehicle lacked illumination at the time of the collision with Petitioner's truck. (See Docket Entry 6-14 at 4-5, 9-10.) Because the MAR court adjudicated that claim on the merits, Section 2254(d)'s "highly deferential standard" governs this Court's review of Petitioner's instant parallel claim. Cullen, ___ U.S. at ___, 131 S. Ct. at 1398. Accordingly, in this context, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington, ___ U.S. at ___, 131 S. Ct. at 786. Petitioner has not made that showing.

As an initial matter, in scrutinizing the MAR court's ruling regarding trial counsel's decision not to present expert testimony on this subject, the Court "must indulge a strong presumption that,

under the circumstances, the challenged action might be considered <u>sound trial strategy</u>. The difficulty of overcoming that general presumption is even greater in this case, given that <u>the decision whether to call a defense witness is a strategic decision</u> demanding the assessment and balancing of perceived benefits against perceived risks, and one to which [the Court] must afford <u>enormous deference</u>." <u>Terry</u>, 366 F.3d at 317 (internal citation, ellipses, and quotation marks omitted) (emphasis added); <u>see also</u> <u>Cox v. United States</u>, Nos. 3:05CR74, 3:08CV201, 2011 WL 3322590, at *6 (W.D.N.C. Aug. 2, 2011) (unpublished) ("The decision whether to call any witnesses on behalf of the defendant . . . is a tactical decision of the sort engaged in by defense attorneys in almost every trial. Such decisions also are entitled to great deference." (internal citation and quotation marks omitted)). Pertinent to the weighing of the pros and cons of offering evidence, North Carolina law "confers upon the defendant in a criminal trial the right to both open and close the final arguments to the jury, <u>provided that no evidence is introduced by the defendant. This right has been deemed to be critically important</u> . . . ." <u>State v. English</u>, 194 N.C. App. 314, 317, 669 S.E.2d 869, 871 (2008) (internal brackets, citation, and quotation marks omitted) (emphasis added).

Here, based on the testimony of Petitioner's trial counsel, the MAR court found as a fact that said trial counsel "believed it was important to have the last argument to the jury . . . and did not put on any evidence because he thought his best chance in winning the case was to have the last argument to the jury and

argue that [Petitioner's] actions on January 1, 2003 did not amount to a finding of culpable negligence." (Docket Entry 6-13 at 32.) "Absent clear and convincing evidence to the contrary, a claim that counsel's decision was premised on trial strategy cannot be disturbed." Hill v. Hershberger, Civil Action No. PJM-12-2386, 2013 WL 3364374, at *6 (D. Md. July 2, 2013) (unpublished); see also 28 U.S.C. § 2254(e)(1) (requiring federal habeas courts to presume state court factual findings correct absent clear and convincing contrary evidence). Petitioner has identified no, much less clear and convincing, evidence to rebut trial counsel's testimony and the MAR court's factual finding on this point. (See Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Pages Seven and Eight); Docket Entry 10 at 3-4; Docket Entry 11 at 17-25.)

The record also reflects (without contradiction and as found by the MAR court) that Petitioner's trial counsel made the decision in question: 1) after "he thought carefully about whether or not he needed to hire an expert witness to testify concerning the accident" (Docket Entry 6-13 at 31; see also Docket Entry 6-14 at 4 ("conclud[ing] [trial counsel] made a thorough investigation of the need to call an expert witness" and citing record support)); and 2) based on more than 40 years of trial experience in North Carolina, during which he earned "an 'A' rating with Martindale-Hubbell," while trying "approximately two murder cases a year since practicing law and approximately one to two jury trials a month involving other criminal cases" (Docket Entry 6-13 at 33). Finally, the MAR court concluded Petitioner "agreed with [his trial

counsel's] decision not to put forth any evidence . . . [given Petitioner's] sworn declarations to the trial court that he did not wish to testify and also did not wish to call any witnesses at his trial." (Docket Entry 6-14 at 4; see also Trial Tr. II 69-75.)

Under these circumstances, at a minimum, the MAR court neither ruled contrary to Strickland nor unreasonably applied Strickland, see 28 U.S.C. § 2254(d)(1), by: 1) holding "that it was sound trial strategy for [Petitioner's trial counsel] not to call any witnesses so that he could argue to the jury last" (Docket Entry 6-14 at 4); 2) declining "to second-guess [trial counsel's] decision not to retain the services of an expert and present the expert's testimony" (id.); and 3) ruling that trial counsel's "decision to not hire an expert and ultimately use expert testimony at [Petitioner's] trial was reasonable under the professional norms at the time of [the] trial" (id. at 5).[11] Petitioner's instant claim

_____

[11] Petitioner's Brief opposing Respondent's summary judgment motion baldly asserts that "[t]he state court adjudication [of this issue] resulted in a decision that was based on an unreasonable determination of the facts . . . ." (Docket Entry 11 at 17.) However, it does not identify any specific factual finding(s) the MAR court purportedly unreasonably made. (See id. at 17-25.) As a result, Petitioner cannot secure relief under Section 2254(d)(2). See Oliver v. Wengler, No. 1:12CV96EJL, 2013 WL 5707342, at *3 (D. Idaho Oct. 21, 2013) (unpublished) ("Although [the] [p]etitioner states . . . that 'a segment of the state courts [sic] decisions are predicated upon an unreasonable determination of the facts,' he does not identify any specific factual finding that he contends is unreasonable. This is insufficient to show that the decisions of the [state court] were based on an unreasonable determination of the facts." (internal citation omitted)); Marcus v. Conway, No. 04CIV64JSR, 2007 WL 1974305, at *6 (S.D.N.Y. July 5, 2007) (unpublished) ("[T]he petitioner's conclusory statement, that the state court's decision is based on an unreasonable determination of the facts in light of the evidence presented at the state court proceedings, does nothing more than quote the applicable statutory language. Without more, that is not sufficient to satisfy the burden placed on [him] by 28 U.S.C. § 2254(d)."); see also Davis v. Jones, 506 F.3d 1325, 1330 n.8 (11th Cir. 2007) (declining to consider "argument that the state court made an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2)," where the petitioner did "not challeng[e] any specific factual finding").

therefore fails as a matter of law.  See Strickland, 466 U.S. at 697 ("[T]here is no reason . . . to address both components of the [performance and prejudice] inquiry if the defendant makes an insufficient showing on one.").

To the extent the Court wishes to consider the prejudice prong of the Strickland test, Petitioner has failed to clear the hurdles imposed by Section 2254(d) as to that element of the instant claim as well.  First, as the MAR court noted, "evidence of three eyewitnesses (two of which [we]re disinterested parties) . . . [indicated] that the headlights of the [victims' vehicle] were on at the time of the accident in question [such] that [Petitioner] has failed to show prejudice by [his trial counsel] failing to retain Mr. [] Moore or another expert witness to testify that the scientific evidence would show that the headlights were off." (Docket Entry 6-14 at 10.)  Second, as documented above, the record does not support a finding that a bulb linked to the headlights of the victims' vehicle exhibited "cold shock," such that Mr. Moore or another expert could have opined that those headlights lacked electrical power upon impact with Petitioner's truck.

In other words, Trooper Smock's failure at trial to specify that the two bulbs he observed as displaying "cold shock" operated the right-side reverse light and right-rear turn-signal, as well as his failure to correct the prosecutor's reference (in a redirect question) to the bulb(s) that showed "cold shock" as "brake lights," created confusion about whether forensic evidence favorable to Petitioner existed, but the MAR hearing testimony from

Trooper Smock and Mr. Moore confirmed that the bulbs actually examined by Trooper Smock revealed nothing about the condition of the headlights at the time of the crash. Accordingly, the key testimony Trooper Smock offered at trial about his "cold shock" finding, i.e., that "it doesn't say anything about the headlights" (Trial Tr. I 86) proved accurate and no prejudice thus resulted from the decision of Petitioner's trial counsel to opt against presenting expert testimony on that subject. Those considerations also defeat this claim, particularly given Section 2254(d)'s stringent requirements, see generally Cullen, ___ U.S. at ___, 131 S. Ct. at 1398; Harrington, ___ U.S. at ___, 131 S. Ct. at 786.

### 4. Failure to Seek Lesser-Included Offense Instruction

The fourth claim within Ground One of the Petition asserts that Petitioner's trial counsel should have "request[ed] a jury instruction on the lesser included offense of misdemeanor assault with a deadly weapon as to two (2) of the victims" (Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Page Eight)) because, "although injured, [they] were not seriously injured" (id. (Continuation Page Nine)).[12] Said claim concerns the federal right to effective representation, but turns on the availability of a lesser-included offense instruction under North Carolina law in this context. Petitioner raised the same basic claim in his MAR (see Docket Entry

---

[12] Petitioner's filings in opposition to Respondent's summary judgment motion do not defend the viability of this claim. (See Docket Entries 10, 11.) However, "in considering a motion for summary judgment, the [Court] 'must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'" Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (quoting Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993)).

6-10 at 32-38) and the MAR court denied it on the merits, relying largely upon State v. Musselwhite, 59 N.C. App. 477, 297 S.E.2d 181 (1982), to resolve the underlying state-law issue (see Docket Entry 6-14 at 23-28). In light of that merits-based denial, Section 2254(d) severely limits this Court's review of Petitioner's instant matching claim. See generally Cullen, ___ U.S. at ___, 131 S. Ct. at 1398; Harrington, ___ U.S. at ___, 131 S. Ct. at 786.

The Musselwhite Court defined "serious injury" under North Carolina law as "'physical or bodily injury resulting from an assault with a deadly weapon.'" Musselwhite, 59 N.C. App. at 480, 297 S.E.2d at 184 (quoting State v. Rotenberry, 54 N.C. App. 504, 511, 284 S.E.2d 197, 201 (1981)). It further described hospitalization as unnecessary, see id., and concluded that "heavy bleeding and [a] cut requiring 8 or 9 stitches were sufficient to send the case to the jury." Id. at 481, 297 S.E.2d at 184. Finally, the Musselwhite Court ruled a lesser-included offense instruction unnecessary where the State's evidence qualified as "positive and uncontradicted." Id.

After reviewing Musselwhite, the MAR court discussed in detail the record regarding the injuries suffered by the two victims in question. (See Docket Entry 6-14 at 24-28.) It found that uncontested evidence established that the collision ejected the first of said victims, eight-year-old Luke Collins, from his vehicle, knocking him unconscious, and causing substantial visible bruising of his forehead and eye sockets, soft-tissue swelling of his head (as revealed by a CT scan), a laceration of his head that

-33-

required suturing, a recurring headache, a puncture wound to his back, and other cuts and scrapes, all of which necessitated hospital care both on the night of the incident and more than a week later. (Id. at 25-27.) Given those findings, the MAR court "conclude[d] that there was no issue as to the seriousness of Luke Collins'[s] injuries. Therefore, [Petitioner's trial counsel] was not deficient for failing to ask for an instruction on misdemeanor assault with a deadly weapon." (Id. at 27.)

Similarly, as to Jimmy Yarborough, the second cited victim:

> Based upon [his] medical records the [MAR] [c]ourt conclude[d] that [he] had a severe laceration to his head that was described in [his] medical records as a "jagged complicated wound." Further, [his] medical records indicate that [he] also suffered a "C 11 fracture" and a "Thoracic # 11 Fracture." . . . [B]ased upon all of the evidence presented by the State of North Carolina at [Petitioner's] trial, [the MAR court] conclude[d] that Mr. Yarborough suffered serious injuries as a result of the accident caused by [Petitioner], that this evidence of serious injuries was uncontradicted and that [Petitioner's trial counsel] was not deficient in failing to ask for an instruction on misdemeanor assault with a deadly weapon.

(Id. at 28.)

The MAR court's foregoing conclusions (i.e., that Petitioner lacked a viable basis under North Carolina law for obtaining a lesser-included offense instruction on these two felony assault charges) foreclose any relief on his instant parallel claim in this Court, because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). In the words used by another court in an analogous context:

> [Petitioner's] argument that the state court unreasonably
> applied <u>Strickland</u> obviously depends upon [the Court]
> determining [his trial counsel's] performance was
> deficient, but first [the Court] would have to conclude
> the state court misinterpreted state law . . . . It is
> a fundamental principle that state courts are the final
> arbiters of state law, and federal habeas courts should
> not second-guess them on such matters. . . . [A state
> court] has already answered the question of what would
> have happened had [Petitioner's counsel] objected [to the
> absence of a lesser-included offense instruction pursuant
> to state law] . . . — the objection would have been
> overruled. Therefore, [Petitioner's counsel] was not
> ineffective for failing to make that objection [and
> Petitioner] . . . cannot be prejudiced by his [trial]
> counsel's failure to make a losing objection.

<u>Callahan v. Campbell</u>, 427 F.3d 897, 932 (11th Cir. 2005) (internal citations and quotation marks omitted); <u>see also</u> <u>Sharpe v. Bell</u>, 593 F.3d 372, 382–83 (4th Cir. 2010) ("[The petitioner] argues that his attorney's failure to argue for the admission of [certain] testimony . . . under North Carolina evidentiary law . . . denied him the right to effective assistance . . . . [T]he [state] court found that [the petitioner] failed both prongs of <u>Strickland</u> because [the] testimony would not have been admissible. . . . The [federal habeas] court cast aside this conclusion . . . . It is beyond the mandate of federal habeas courts, however, to correct the interpretation by state courts of a state's own laws."). Under Section 2254(d), this claim thus falls short as a matter of law.

### 5. Failure to Object to Testimony by Ms. Oliver

In the fifth claim of ineffective assistance set forth in Ground One, the Petition complains that trial counsel "fail[ed] to object to the improper testimony of [Ms.] Oliver regarding Petitioner's thoughts or intent while driving his vehicle at the

time of the accident." (Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Page Ten).) In that regard, Petitioner focuses on Ms. Oliver's statement at trial that "'It almost seemed like to me that [Petitioner's] truck hesitated and then gunned it like it wanted to meet the car.'" (Id. (quoting Trial Tr. I 130) (bracket in Petition).)[13] Petitioner raised an identical claim in his MAR (see Docket Entry 6-10 at 29-31) and the MAR court denied it on the merits (see Docket Entry 6-14 at 12-16). Accordingly, in pursuing the instant matching claim, Petitioner must satisfy the hard-to-meet test prescribed by Section 2254(d). See generally Cullen, ___ U.S. at ___, 131 S. Ct. at 1398; Harrington, ___ U.S. at ___, 131 S. Ct. at 786. He has not done so, i.e., he has failed to show that the MAR court ruled contrary to/unreasonably applied Strickland and/or relied on unreasonable factual determinations.

The MAR court began its detailed analysis of this issue by noting that Petitioner's trial counsel testified at the MAR hearing that he "was observing the jury at the time Ms. Oliver was testifying concerning the movement of [Petitioner's] vehicle and decided as a strategic decision not to object to her testimony because she was emotional and [trial counsel] had been overruled by the trial court on an earlier objection." (Docket Entry 6-14 at 12.) Crediting that testimony, the MAR court "conclude[d] that [trial counsel] made a strategic decision not to object to the testimony of Ms. Oliver . . . ." (Id.) Given Petitioner's failure

---

[13] Ms. Oliver and her husband "were traveling approximately three to four car lengths behind [the victims'] vehicle and witnessed the collision." Cearley, 2005 WL 1805026, at *2.

to point to any (much less clear and convincing) contrary evidence (see Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Pages Ten and Eleven); Docket Entry 10 at 3-4; Docket Entry 11 at 31-33), that finding "cannot be disturbed," Hill, 2013 WL 3364374, at *6; see also 28 U.S.C. 2254(e)(1). In addition, after reiterating that case law applying Strickland has recognized "attorneys are given wide latitude when it comes to matters of trial strategy" (Docket Entry 6-14 at 12), the MAR court ruled trial counsel's "decision was sound legal strategy . . . [that it was] not going to second-guess . . . because as the trial transcript indicates Ms. Oliver was in fact emotional at the time she made the statement concerning the truck being 'gunned' and also [trial counsel] had previously been overruled by the trial court on an earlier objection" (id.).

Courts have recognized the validity of the sorts of tactical considerations approved by the MAR court. See, e.g., Phyle v. Leapley, 66 F.3d 154, 159 (8th Cir. 1995) (ruling that, in making split-second decisions about whether or not to object, attorneys must have freedom to consider factors such as witness's demeanor and jury's reaction); United States v. Loukas, No. 89-2033, 909 F.2d 1485 (table), 1990 WL 99496, at *4 (6th Cir. July 18, 1990) (unpublished) ("There are a host of reasons why trial counsel might decide to forego an arguably sound evidentiary objection. A strategic decision not to object where an objection might not be sustained . . . may well be wise, rather than ineffective counseling."); Hill v. Shearin, Civil Action No. RWT-10-1689, 2011 WL 2413348, at *7 (D. Md. June 8, 2011) (unpublished) (finding no

basis for relief under Section 2254(d) where state collateral court credited defense counsel's testimony that he refrained from objecting to adverse trial testimony because, in his experience, "objections tend to alienate jurors"); <u>Hall v. Cain</u>, Civil Action No. 99-0541-BAJ-DLD, 2011 WL 2883132, at *24 (M.D. La. May 20, 2011) (unpublished) (agreeing that trial attorney reasonably may refrain from objecting because of concern that "interrupting [a] witness'[s] emotional testimony . . . may have prejudiced the jury against [the attorney]"), <u>recommendation adopted</u>, 2011 WL 2883588 (M.D. La. July 13, 2011) (unpublished); <u>Parker v. Hendricks</u>, No. 03-CV914DMC, 2010 WL 2652407, at *12 n.6 (D.N.J. June 24, 2010) (unpublished) (acknowledging that attorney properly may consider possible negative effect of jury seeing judge overrule objection); <u>Hudgins v. New York</u>, No. 07CV01862JFB, 2009 WL 1703266, at *13 (E.D.N.Y. June 18, 2009) (unpublished) ("[T]here are strategic reasons an attorney might forego objections [including] the conclusion that additional objections might have annoyed the judge or jury . . . ." (internal quotation marks omitted)).

The MAR court further concluded that any objection to Ms. Oliver's testimony would have failed because, in North Carolina, "there is case law that shows that Ms. Oliver's statement concerning the movement of [Petitioner's] truck could be considered a shorthand statement of fact that is admissible in evidence." (Docket Entry 6-14 at 12-13.)  In support of that determination, the MAR court cited and quoted at length from several North Carolina appellate decisions on point.  (<u>See</u> <u>id.</u> at 13-15

(discussing <u>State v. Eason</u>, 336 N.C. 730, 445 S.E.2d 917 (1994), <u>Horne v. Trivette</u>, 58 N.C. App. 77, 295 S.E.2d 290 (1982), and <u>Peterson v. Johnson</u>, 28 N.C. App. 527, 221 S.E.2d 920 (1976)).) "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," <u>Estelle</u>, 502 U.S. at 67-68, and, accepting that North Carolina law would have rendered any objection in this context futile, this Court must conclude that the MAR court reasonably ruled that Petitioner's trial counsel "was not ineffective for failing to make that objection . . . [and that Petitioner] cannot [have] be[en] prejudiced by his [trial] counsel's failure to make a losing objection," <u>Callahan</u>, 427 F.3d at 932; <u>see also</u> <u>Sharpe</u>, 593 F.3d at 382-83 (4th Cir. 2010) ("[The petitioner] argues that his attorney's failure to argue for the admission of [certain] testimony . . . under North Carolina evidentiary law . . . denied him the right to effective assistance . . . . [T]he [state] court found that [the petitioner] failed both prongs of <u>Strickland</u> because [the] testimony would not have been admissible . . . . The [federal habeas] court cast aside this conclusion . . . . It is beyond the mandate of federal habeas courts, however, to correct the interpretation by state courts of a state's own laws."). In sum, the Court should deny this claim pursuant to Section 2254(d).

## 6. Failure to Offer Mitigating Evidence at Sentencing

The final claim of ineffective assistance encompassed within Ground One of the Petition focuses on the alleged failure of Petitioner's trial counsel "to adequately prepare and present

mitigating evidence at sentencing." (Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Page Eleven).) In terms of specific evidence trial counsel allegedly should have introduced, the Petition mentions only matters related to the "dangerous nature of the intersection" (id.), i.e., that: 1) the intersection "was created by the reconfiguration of Highway 21 and Old 421" (id.); 2) the intersection "had been the situs of numerous traffic accidents where other drivers who were not deemed to be culpably negligent, ran through the stop sign at the intersection without slowing down and struck other vehicles" (id.); and 3) "Petitioner's unfamiliarity with the new configuration on Old U.S. 421 caused Petitioner to run through the intersection without slowing down" (id. (Continuation Pages Eleven-Twelve).) Petitioner's MAR raised items one and three from the foregoing list, but not item two. (See Docket Entry 6-10 at 42-46.)[14]

Petitioner thus has not exhausted any claim premised on his trial counsel's failure "to prepare and present" evidence at sentencing about "numerous traffic accidents where other drivers who were not deemed to be culpably negligent, ran through the stop sign at the intersection without slowing down and struck other vehicles" (Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Page Eleven) and, therefore, that aspect of the instant claim currently cannot provide a basis for federal habeas relief, see 28 U.S.C.

---

[14] Petitioner's amendments to the MAR also do not assert an ineffective assistance claim based on trial counsel's failure to offer evidence at sentencing of other accidents at the intersection. (See Docket Entries 6-11, 6-12.)

§ 2254(b)(1)(A);[15] however, it "may be denied on the merits, notwithstanding the failure of [Petitioner] to exhaust the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(2). The Court should effect such a denial because, as discussed in Section IV.A.2., Petitioner has identified neither competent evidence that any particular number of accidents, in fact, occurred at the intersection nor competent evidence that the number of accidents that actually did occur would support an inference that the intersection posed special danger. Further, Petitioner has cited no evidence establishing that drivers in any comparable collisions at the intersection "were not deemed to be culpably negligent" (Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Page Eleven)). (See id. (Continuation Pages Eleven and Twelve); Docket Entry 10 at 3-4; Docket Entry 11 at 26-30.) Absent even a colorable proffer of "what materially helpful evidence or testimony would have been [presented] had trial counsel taken the actions Petitioner now says [trial counsel] should have . . ., [this part of the instant] claim[] of ineffective assistance of trial counsel [is] conclusory and speculative and do[es] not support a claim for relief . . . ." Broadnax, 2008 WL 762255, at *9.

The two related, remaining elements of this claim (i.e, that Petitioner's trial counsel should have offered evidence at

---

[15] Petitioner has not alleged, in connection with this claim, that "there is an absence of available State corrective process; or . . . [that] circumstances exist that render such process ineffective to protect [his] rights," 28 U.S.C. § 2254(b)(1)(B). (See Docket Entry 1, ¶ 12(Ground One); Docket Entry 10 at 3-4; Docket Entry 11 at 26-30.) Nor does it appear that "the State, through counsel, expressly waive[d] the [exhaustion] requirement," 28 U.S.C. § 2254(b)(3) (emphasis added). (See Docket Entries 4, 5, 6.)

sentencing that the reconfiguration of the subject intersection and Petitioner's lack of familiarity therewith made the intersection dangerous so as to mitigate his culpability) similarly do not warrant habeas relief. The MAR court denied such claim(s) on the merits, finding against Petitioner on <u>Strickland</u>'s prejudice prong:

> [Petitioner] has failed to prove prejudice by [his trial counsel's] failure to provide evidence to the trial court during the sentencing phase concerning . . . the alleged dangerousness of the intersection. . . . [T]he [MAR] [c]ourt is not convinced that evidence of the alleged dangerousness of the intersection in question would have made a difference in [the] sentencing hearing due to the fact that the trial court was already aware of this issue due to [Mr.] Fleming's testimony on voir dire [about the reconfiguration of the intersection and the effect that reconfiguration potentially had on persons accustomed to the prior configuration] and further [Petitioner's] actions before and after the accident demonstrate a clear showing of culpable negligence. . . . [F]urthermore, [Petitioner] upon returning to the accident scene gave false information that led to an innocent man's arrest for a crime he did not commit. . . . [While] talking with the troopers [five months after the crash, Petitioner] still contended that he was not the driver . . . . [Petitioner's] actions led to the death of Mary Yarborough and caused serious injuries to four of the occupants of the [victims' vehicle]. [Petitioner] ran through the accident scene where a woman and children were lying on the roadway bleeding and in need of medical treatment. . . . There was absolutely no evidence that [Petitioner] showed any concern for the victims of the accident in that he ran away from the scene [and] did not call for medical assistance for the victims, but rather went to the home of [Mr.] Fleming and asked Mr. Fleming for a ride to Boonville . . . . Based upon the overwhelming evidence against [Petitioner] and [his] actions after the accident . . ., [he] has failed to prove that [he] was prejudiced by his attorney's alleged ineffectiveness at his sentencing hearing . . . .

(Docket Entry 6-14 at 36-37.)

In addition, elsewhere in its decision, the MAR court observed that Petitioner could not contend that the reconfiguration of the

-42-

subject intersection played any part in his collision with the victims' vehicle because, during an interview with Trooper Caudill, Petitioner admitted he had no familiarity with the prior configuration. (See id. at 8 (quoting from Petitioner's statement to Trooper Caudill).) That fact led the MAR court to conclude that evidence "concerning the habits of other motorists at the intersection" would not have assisted Petitioner. (Id.)

In the face of the foregoing, scrupulous analysis by the MAR court, Petitioner submitted no meaningful argument as to how the ruling against him under Strickland's prejudice prong qualifies as unreasonable (legally or factually), much less contrary to Supreme Court precedent. (See Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Pages Eleven and Twelve); Docket Entry 10 at 3-4; Docket Entry 11 at 26-30.) That failure precludes relief in this Court. See, e.g., Saxon v. Lempke, No. 09CIV1057(PGG)(KNF), 2014 WL 1168989, at *17 (S.D.N.Y. Mar. 21, 2014) (unpublished) ("[The magistrate judge] found that [the petitioner] had not demonstrated that the state court's determination denying this claim is 'contrary to or an unreasonable application of Strickland.' [The magistrate judge] further found that [the petitioner's] conclusory statements are insufficient to satisfy his burden under Section 2254(d). This [c]ourt finds no error in [those] determinations." (internal citations omitted)); Sturgis v. Toole, No. CV111-040, 2012 WL 2862031, at *5 (S.D. Ga. May 14, 2012) (unpublished) ("In his § 2254 petition and brief, [the] [p]etitioner provides nothing beyond conclusory assertions that [the state court's] rejection of

-43-

these claims was 'erroneous' and 'objectively unreasonable.' In light of the deference to the state court decision required by § 2254(d), these conclusory assertions are plainly inadequate for [the] [p]etitioner to prevail . . . ." (internal citations omitted)), <u>recommendation adopted</u>, 2012 WL 2862047 (S.D. Ga. July 11, 2012) (unpublished), <u>appeal dismissed</u>, slip op., No. 12-14130 (11th Cir. Oct. 24, 2012). The Court should enter judgment against Petitioner (under Section 2254(d)) on his claim that his trial counsel rendered ineffective assistance by failing to present evidence at sentencing that the reconfiguration of the intersection and/or Petitioner's unfamiliarity with that reconfiguration made the intersection dangerous.[16]

---

[16] Although Petitioner clearly identified this claim as addressing trial counsel's "fail[ure] to adequately prepare and present mitigating evidence at sentencing" (Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Page Eleven)), at the end of the recitation of "Supporting Facts," Petitioner refers to a matter unrelated to sentencing evidence, i.e, that "[trial] counsel was ineffective in failing to even argue for a consolidated sentence, or that the sentences should run concurrently with each other [and] due to [that] failure Petitioner received five (5) consecutive sentences" (<u>id.</u> (Continuation Page Twelve)). Petitioner included such a claim in his MAR. (<u>See</u> Docket Entry 6-10 at 45-46.) The MAR court's decision does not make specific reference to the lack of a request by trial counsel for a consolidated sentence or concurrent sentences, but does explicitly: 1) take note that Petitioner's MAR alleged ineffective assistance based on trial counsel's "fail[ure] to properly advocate for [Petitioner] at sentencing" (Docket Entry 6-14 at 33); 2) discuss case law regarding an attorney's duty at sentencing to make "'the most effective statement possible in light of the available dispositional opportunities'" (<u>id.</u> (quoting <u>State v. Davidson</u>, 77 N.C. App. 540, 546, 335 S.E.2d 518, 522 (1985) (internal ellipses omitted)); 3) review portions of the record documenting trial counsel's successful opposition to the State's request for sentences in the aggravated range, as well as trial counsel's presentation of mitigating evidence via testimony from Petitioner's mother (<u>id.</u> at 34); and 4) describe trial counsel's sentencing argument and his subsequent MAR hearing testimony regarding his successful use of that form of "equitable" argument over the course of his career (<u>id.</u>). The MAR court thereafter expressly found that trial counsel "was exercising a strategic decision in making his equitable argument and [ruled that it was] not going to second-guess the decision in hindsight mindful of the decisions [condemning such an approach]." (<u>Id.</u>) Finally, the MAR court "conclude[d] that [trial counsel's sentencing] argument . . . w[as] not deficient and that trial counsel exercised sound legal strategy . . . ." (<u>Id.</u> at 35.) To
(continued...)

## B. Ineffective Assistance of Appellate Counsel

Petitioner titled Ground Two of the Petition "Ineffective Assistance of Appellate Counsel on Direct Appeal." (Docket Entry 1, ¶ 12(Ground Two).)[17]  The performance and prejudice test from Strickland applies to such claims.  Evans v. Thompson, 881 F.2d 117, 124 (4th Cir. 1989).  Consistent with the "deferential" nature of the Strickland standard, Harrington, ___ U.S. at ___, 131 S. Ct. at 788, appellate counsel need not raise every non-frivolous issue; to the contrary, forsaking reasonably perceived weaker appeal issues to focus on a small number of arguably stronger ones constitutes a mark of effective advocacy.  Jones v. Barnes, 463 U.S. 745, 750-54 (1983); Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (en banc).  Moreover, "reviewing courts must accord appellate counsel the presumption that he [or she] decided which issues were most likely to afford relief on appeal."  Bell, 236 F.3d at 164 (internal quotation marks omitted); see also Evans, 881 F.2d at 124 (declaring that counsel pursued sound strategy when "he

---

[16](...continued)
the extent the Court deems Petitioner to have asserted an ineffective assistance claim based on trial counsel's failure to expressly request consolidation of sentences or imposition of concurrent sentences, neither the Petition's single line about that subject (see Docket Entry 1, ¶ 12(Ground One)(a) (Continuation Page Twelve)), nor anything in the portions of Petitioner's filings opposing Respondent's summary judgment motion that address ineffective assistance at sentencing (see Docket Entry 10 at 3-4; Docket Entry 11 at 26-30), provides a valid basis under Section 2254(d) to reject the MAR court's denial of that claim. See, e.g., Saxon, 2014 WL 1168989, at *17; Sturgis, 2012 WL 2862031, at *5.

[17] Petitioner's filings in opposition to Respondent's summary judgment motion do not defend the viability of any claim(s) in Ground Two. (See Docket Entries 10, 11.)  However, "in considering a motion for summary judgment, the [Court] 'must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'"  Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (quoting Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993)).

determined what he believed to be [the] petitioner's most viable arguments and raised them on appeal").  Finally, where Section 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Harrington</u>, ___ U.S. at ___, 131 S. Ct. at 788.

## 1.  Failure to Appeal Sustaining of Objection about Intersection

Ground Two of the Petition first contends that appellate counsel provided ineffective assistance by "failing to raise and argue on direct appeal the trial court's error of sustaining the prosecutor's objection to [Petitioner's trial] counsel's question of Trooper Smock regarding the dangerous nature of the intersection and whether he was aware of previous accidents . . . ."  (Docket Entry 1, ¶ 12(Ground Two)(a).)  The Petition offers nothing beyond that bald assertion (<u>see</u> <u>id.</u> (Continuation Page Twelve)) and Petitioner's filings opposing Respondent's summary judgment motion lack any reference to the matter (<u>see</u> Docket Entries 10, 11).  As a result, this claim fails.  <u>See, e.g.</u>, <u>Jones v. Gomez</u>, 66 F.3d 199, 205 (9th Cir. 1995) ("We also agree with the district court that [the petitioner's] conclusory suggestions that his . . . appellate counsel provided ineffective assistance fall far short of stating a valid claim of constitutional violation."); <u>Lamonda v. United States</u>, Nos. 6:11CV1488ORL28GJK, 6:05CR131ORL28GJK, 2013 WL 6145427, at *13 (M.D. Fla. Nov. 21, 2013) (unpublished) ("[The petitioner] fails to establish how appellate counsel's performance was deficient [in not raising on appeal the exclusion of allegedly

exculpatory evidence] or how [that deficiency] affected the outcome of the appeal. [The petitioner's] allegations are too vague and conclusory to support a claim of ineffective assistance of appellate counsel."); Sutherland v. Booker, No. 1:10CV629, 2013 WL 5304081, at *8 (W.D. Mich. Sept. 19, 2013) (unpublished) ("While [the] petitioner has pointed out additional issues that [his] appellate counsel could have conceivably brought, he has not demonstrated that these issues were stronger than the issues presented on appeal, that there is a reasonable probability that he would have prevailed on appeal with the inclusion of these issues, and that these issues were so compelling that [his] appellate counsel's failure to raise them amounted to ineffective assistance of appellate counsel. An unsupported allegation of ineffective assistance of counsel fails to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Accordingly, [the] petitioner has failed to demonstrate IAAC [ineffective assistance of appellate counsel] . . . ." (internal citations and quotation marks omitted)).

Further, Section 2254(d) applies to this claim, because Petitioner raised it in his MAR (see Docket Entry 6-10 at 31-32) and the MAR court denied it on the merits (indeed, in a thorough, well-supported, and well-reasoned fashion) (see Docket Entry 6-14 at 21-23). Given Petitioner's perfunctory presentation of this claim in his Petition and his failure to address it when he responded to Respondent's summary judgment motion, Petitioner clearly has not established a basis for relief under Section

2254(d).  See, e.g., Icenhour v. Medlin, No. CV612-116, 2013 WL 3270421, at *1 (S.D. Ga. June 26, 2013) (unpublished) ("[The petitioner's] conclusory assertions that the state habeas corpus court erred under § 2254 in applying Strickland to the ineffective assistance of appellate counsel claims before it do not warrant federal relief . . . ."), aff'd, No. 13-13385, 2014 WL 2178978 (11th Cir. May 27, 2014) (unpublished); see also Cullen, ___ U.S. at ___, 131 S. Ct. at 1398 (noting that Section 2254(d) imposes "a difficult to meet and highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt . . . [and that a] petitioner carries the burden of proof" (internal citations and quotation marks omitted)).  In light of all these considerations, this claim cannot survive summary judgment.

## 2. Failure to Appeal Overruling of Objection to Speed Opinion

Within Ground Two of the Petition, Petitioner also alleges as follows:  "[Appellate] counsel was ineffective on direct appeal in failing to raise and argue the trial court's error in overruling Petitioner's trial counsel's objection to [Ms.] Oliver's lay opinion as to the speed of Petitioner's vehicle." (Docket Entry 1, ¶ 12(Ground Two)(a) (Continuation Page Twelve).)  The foregoing sentence represents the entirety of Petitioner's presentation on this issue, both in the Petition (see id.) and his filings opposing Respondent's summary judgment motion (see Docket Entries 10, 11). The record also reflects that Petitioner raised this same claim in an amendment to his MAR (see Docket Entry 6-11 at 2-5) and that the MAR court denied it on the merits (again via a comprehensive,

factually-, legally-, and analytically-sound decision) (see Docket Entry 6-14 at 39-44). As a result, for the same reasons and based on the same authority identified in Section IV.B.1., the Court should refuse relief on this claim as well.

## C. Insufficiency of the Evidence

Under the title "Conviction Obtained upon Insufficient Evidence," the Petition's Ground Three states in its entirety: "[T]here was insufficient evidence presented to prove culpable negligence to convict Petitioner of involuntary manslaughter and the four counts of assault with a deadly weapon inflicting serious injury." (Docket Entry 1, ¶ 12(Ground Three)(a).) In his Brief opposing Respondent's summary judgment motion, Petitioner acknowledged that, on direct appeal, "[t]he North Carolina Court of Appeals adjudicat[ed] [] this claim . . . ." (Docket Entry 11 at 34.) Specifically, that court held:

> [Petitioner] contends in related assignments of error that the trial court erred in failing to dismiss both the charge of involuntary manslaughter and the four charges of assault with a deadly weapon inflicting serious injury, as there was no evidence of culpable negligence. We disagree. . . .
>
> [Petitioner] conceded at trial that he violated N.C. Gen. Stat. § 20-158 (2003), the safety statute governing control signals and signs. . . .
>
> When a safety statute is unintentionally violated, culpable negligence exists where the violation is accompanied by recklessness of probable consequences of a dangerous nature, when tested by the rule of reasonable foreseeability, amounting altogether to a thoughtless disregard of consequences or of a heedless indifference to the safety of others.
>
> A violation of § 20-158 is not negligence per se in any action at law for injury to person or property. However,

-49-

the failure to stop at a stop sign before entering an intersection with a dominant highway may be considered with other facts in the case in determining whether or not under all the facts and circumstances involved, such driver was guilty of culpable negligence. Our courts have considered factors in combination such as speed, reckless driving, and failure to heed a safety statute in determining whether evidence of culpable negligence existed.

We, therefore, review the record to determine whether there was sufficient evidence of recklessness or carelessness as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others, under all the facts and circumstances involved . . . .

Here, the evidence, when taken in the light most favorable to the State, shows that [Petitioner] conceded in his statement to police that he violated a safety statute in failing to heed the stop sign at the Rocky Branch Road/U.S. 21 intersection. [Petitioner], in his statement to police, further indicated that the intersection was not clearly marked, that he thought he was traveling on a straight highway, and that he did not see the intersection when he approached it as an explanation for his failure to heed the stop sign.

Extensive evidence was presented at trial, however, to show that multiple signs and devices had been erected to alert motorists to the approaching intersection along Rocky Branch Road. Prior to reaching the intersection, three visual cues had been erected to warn drivers of the approaching intersection. A stop ahead sign was erected 900 feet from the intersection. Two stop signs were erected immediately prior to the intersection, one standard regulation size, and the second significantly larger. In addition to the visual markers, two sets of hard, raised plastic rumble strips had been placed in the roadway to alert motorists to the impending intersection by creating noise and vibration. The first set of rumble strips was located 674 feet prior to the intersection. A second set of fourteen raised strips was located 457 feet before the intersection.

In addition to the numerous warning devices indicating an intersection was imminent, the State also offered evidence as to the clear visibility of the intersection. Trooper Smock testified there were no obstructions which would prevent a motorist from seeing approaching vehicles on the intersecting road, and both of the Olivers

testified [Petitioner's] truck was clearly visible as it approached the intersection. Evidence was also offered that [Petitioner] was traveling at sixty miles per hour, five miles above the posted speed limit, at the time of the collision. Finally, the State presented evidence that [Petitioner] fled the scene immediately following the collision, and that his oral and written statements were contradicted both by testimony of witnesses at the collision site and by his own later statement. [Petitioner] in his original statement to police, stated that the "driver got out and ran. I ran to see if everyone was ok and get someone to call 911. I looked everywhere, then I came back to the scene." However, testimony at trial by [Ms. Oliver] and [Mr.] Fleming indicated [Petitioner] exited the truck, and after running more than a mile, attempted to persuade [Mr.] Fleming to help him flee the scene entirely. [Petitioner] only returned to the scene of the accident after [Mr.] Fleming refused to take him further, and then provided false information as to the identity of the driver at the site of the collision. [Petitioner] again provided false information when he was interviewed by police several months later on 4 June 2003. [Petitioner] did not confess to being the driver of the vehicle until 5 June 2003, after being presented with evidence of inconsistencies in his statement.

When all the facts and circumstances are viewed in the light most favorable to the State, [Petitioner's] actions demonstrate evidence of recklessness, which when tested by the rule of reasonable prevision, amounts altogether to a thoughtless disregard of consequences sufficient to support a finding of culpable negligence. In addition to [Petitioner's] acknowledged violation of the stop sign, [his] failure to heed any of the multiple warning mechanisms preceding the intersection, including the multiple sets of rumble strips, failure to keep a proper lookout for other vehicles, and violation of the posted speed limit, when taken together, provide evidence of culpable negligence. Further, [Petitioner's] post-accident behavior in deliberately providing false information to the investigating officer at the scene, thereby delaying investigation into his own culpability for several months, provides additional evidence of recklessness that imports a heedless indifference to the safety and rights of others.

. . . . [T]he trial court did not err in denying [Petitioner's] motion to dismiss the charges of involuntary manslaughter and assault with a deadly weapon inflicting serious injury for insufficient evidence.

<u>Cearley</u>, 2005 WL 1805026, at *2-5 (internal brackets, citations, ellipses, and some quotation marks omitted) (emphasis added).

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>Jackson v. Virginia</u>, 443 U.S. 307, 315 (1979) (internal quotation marks omitted). As a general matter, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Id.</u> at 324.[18] However, when Section 2254(d) applies (i.e., when a state court has adjudicated the sufficiency claim on the merits), federal habeas courts "inquire whether [the] state court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of the standard enunciated in <u>Jackson</u>." <u>Williams v. Ozmint</u>, 494 F.3d 478, 489 (4th Cir. 2007) (internal brackets and quotation marks omitted); see also <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1398 (observing that Section 2254(d) imposes "a difficult to meet and highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt . . . [and that a] petitioner carries the burden of proof" (internal citations and quotation marks omitted)).

---

[18] "[This] standard must be applied with explicit reference to the substantive elements of the criminal offense <u>as defined by state law</u>." <u>Jackson</u>, 443 U.S. at 324 n.16 (emphasis added).

As the Supreme Court recently explained:

> Jackson claims face a high bar in federal habeas
> proceedings because they are subject to two layers of
> judicial deference. First, on direct appeal, it is the
> responsibility of the jury — not the court — to decide
> what conclusions should be drawn from evidence admitted
> at trial. A reviewing court may set aside the jury's
> verdict on the ground of insufficient evidence only if no
> rational trier of fact could have agreed with the jury.
> And second, on habeas review, a federal court may not
> overturn a state court decision rejecting a sufficiency
> of the evidence challenge simply because the federal
> court disagrees with the state court. The federal court
> instead may do so only if the state court decision was
> objectively unreasonable.

Coleman v. Johnson, ___ U.S. ___, ___, 132 S. Ct. 2060, 2062 (2012)

(internal citation and quotation marks omitted). Petitioner has

not made the required showing here. To the contrary, the above-

quoted analysis by the North Carolina Court of Appeals documents

the existence of more than sufficient evidence at trial to support

the jury's finding against Petitioner on the offense element of

culpable negligence (for the involuntary murder and assault with a

deadly weapon inflicting serious injury charges). Accordingly,

Petitioner's instant claim would fail even if analyzed only under

Jackson and certainly falls short when viewed through the lens of

Section 2254(d). See generally Harrington, ___ U.S. at ___, 131 S.

Ct. at 786 ("Section 2254(d) reflects the view that habeas corpus

is a guard against extreme malfunctions in the state criminal

justice systems, not a substitute for ordinary error correction

through appeal." (internal quotation marks omitted)).

First, the Petition sets out no facts to support the view that

the North Carolina Court of Appeals unreasonably deemed sufficient

the trial evidence of culpable negligence. (See Docket Entry 1, ¶ 12(Ground Three)(a).) Second, none of Petitioner's contentions about the state of the evidence as to culpable negligence in his Response and Brief opposing Respondent's summary judgment motion (see Docket Entry 10 at 4-5; Docket Entry 11 at 34-38) come close to establishing (as mandated for relief under Section 2254(d)) "that the state court's ruling on [that issue] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," Harrington, ___ U.S. at ___, 131 S. Ct. at 786-87.

For example, Petitioner asserts that "investigations conducted by the North Carolina Highway Patrol concluded that [he] done [sic] no more than run a stop sign." (Docket Entry 11 at 34.) In fact, as the above-quoted language from the North Carolina Court of Appeals details, the evidence at trial demonstrated that Petitioner did not simply run a stop sign, but that he did so 1) at full-speed (indeed, above the speed-limit, according to one witness), 2) after ignoring not only a regulation-sized stop sign, but also a second, much larger stop sign and an additional stop ahead sign, 3) as well as without heeding two sets of hard, raised plastic rumble strips that caused noise and vibration inside vehicles driven over them, and 4) while failing to take notice of an unobstructed intersection and the victims' oncoming vehicle. Additionally, the record (again as detailed by the North Carolina Court of Appeals in the portion of its ruling excerpted both in this Section and in Section I) indicates that, following the collision (not only immediately, but

also later that same evening and for months thereafter), Petitioner exhibited numerous signs of consciousness of guilt, including fleeing the scene and repeatedly lying about his involvement (even to the point of willfully attempting to frame an innocent man).[19]

Similarly, although Petitioner asserts that "[t]here was evidence in the record that this intersection where the accident occurred had recently been reconfigured, [and] was a dangerous intersection, [at which] numerous other accidents had occurred" (id. at 36), as discussed in Sections IV.A.2. and IV.A.6., the record (even looking beyond the trial transcript and considering material adduced during the state post-conviction proceedings) actually lacks competent evidence of the number of accidents at the intersection, as well as the number of accidents necessary to mark the intersection as particularly dangerous; moreover, the discussion set out in Section IV.A.6. confirms that Petitioner could not plausibly attribute his failure to stop at the intersection to confusion stemming from its reconfiguration because, when interviewed, he professed unfamiliarity with the prior configuration. Nor does the record bear out Petitioner's

---

[19] Petitioner objects, without citation of authority, to the North Carolina Court of Appeals considering his "conduct after the accident . . . to establish culpable negligence." (Docket Entry 11 at 36-37.) Case law defeats that objection. See State v. Clayton, 272 N.C. 377, 381, 158 S.E.2d 557, 560 (1968) (identifying the defendant's "flight from the scene of the accident" as an example of the evidence "establish[ing] [his] culpable negligence" in affirming manslaughter conviction); see also United States v. Phibbs, 999 F.3d 1053, 1067 (6th Cir. 1993) ("The fact that a defendant sought to escape prosecution is usually relevant in establishing culpability . . . ."); United States v. Martindale, 790 F.3d 1129, 1132-33 (4th Cir. 1986) ("[E]xculpatory statements of the defendant, if shown to be false and fabricated, are clearly admissible to prove [his] guilty state of mind, and as evidence of guilt, of illicit intent and of consciousness of guilt." (internal brackets and quotation marks omitted)).

contention that the "[North Carolina] Court of Appeals was misled to believe that the road on which [he] was traveling contained multiple sets of hard raised plastic rumble strips . . . . [A]ccident reconstruction expert [Mr.] Moore determined that these lines referred to as rumble strips were actually lines that were spray painted on the road surface . . . ." (Id. at 37.) Rather, at the MAR hearing, Mr. Moore confirmed that "these rumble strips are not paint . . . . The technical term is it's raised thermoplastic markers. . . . Paint is different. It's much thinner." (MAR Hrg. Tr. 365; see also MAR Hrg. Tr. 361 ("If North Carolina calls them rumble strips, I'm not going to disagree with North Carolina."), 370 ("They are not painted lines; correct."), 376 ("Q. Because this isn't paint; this is thermoplastic? A. This is thermoplastic, correct.").)

Simply put, Ground Three of the Petition provides no basis for habeas relief, particularly given Section 2254(d)'s applicability.

### D.  Motion for Discovery

More than six months after he responded to Respondent's summary judgment motion, Petitioner filed a request for leave to conduct discovery. (Docket Entry 12.) "Unlike other civil litigants, a § 2254 habeas petitioner 'is not entitled to discovery as a matter of ordinary course.'" Stephens v. Branker, 570 F.3d 198, 213 (4th Cir. 2009) (quoting Bracy v. Gramley, 520 U.S. 899, 904 (1997)). Instead, to secure discovery, a habeas petitioner "must provide reasons for the request," Rule 6(b), Rules Governing Sect. 2254 Cases, that establish "good cause," Rule 6(a), Rules

Governing Sect. 2254 Cases.  "A showing of good cause must include specific allegations suggesting that the petitioner will be able to demonstrate that he is entitled to habeas corpus relief." Stephens, 570 F.3d at 204 (emphasis added).

Moreover, the United States Supreme Court recently made clear that, "[a]lthough state prisoners may sometimes submit new evidence in federal court, [the Antiterrorism and Effective Death Penalty Act of 1996's] statutory scheme [as codified in part in Section 2254] is designed to strongly discourage them from doing so." Cullen, ___ U.S. at ___, 131 S. Ct. at 1401.  In light of that principle, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  Id. at ___, 131 S. Ct. at 1400 (emphasis added).  In other words, to the extent Section 2254(d) applies, "good cause" does not exist for discovery (at least before the analysis required under Section 2254(d)), because this Court may look only to the state court record in applying Section 2254(d).  See, e.g., Wood v. Ryan, 693 F.3d 1104, 1122 (9th Cir. 2012) ("[The petitioner] is not entitled to . . . additional discovery in federal court because this ineffective assistance of counsel claim is governed by 28 U.S.C. § 2254(d)(1), as it was adjudicated on the merits in the [state court] proceedings." (citing Cullen, ___ U.S. at ___, 131 S. Ct. at 1398)), cert. denied, ___ U.S. ___, 134 S. Ct. 239 (2013).[20]

---

[20] Even when Section 2254(d) does not apply, "[Section] 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence (continued...)

In this instance, Petitioner has asked for permission to demand from Respondent: 1) "documentation of finding of culpable negligence from Troopers Smock, Caudill, and Mathis" (Docket Entry 12 at 1); 2) "information to [sic] why Trooper Mathis . . . 'did not' testify and was never asked to attend the trial" (id.); 3) "actual facts to support the cause of death to Mary [] Yarborough" and an answer as to whether "an autopsy [was] performed to prove the allegation that the car accident [wa]s the actual cause of death" (id. at 2); 4) an explanation for "why the [state] court did not declare a mistrial nor did they prosecute or charge Trooper Smock for admitting that he gave false testimony in [Petitioner's] trial" (id.); 5) "evidence to show how [Ms.] Oliver or anyone could form any kind of thoughts or intentions of [Petitioner's] actions without being in [his] vehicle to observe him first hand" (id.); and 6) "evidence that Engineer from D.O.T. Mr. Trent Beaver physically visited the accident scene to observe the 'so-called' rumble strips first hand" (id.). Petitioner offered no argument to support these requests. (See id. at 1-3.) Nor did he file a brief. (See Docket Entries dated Feb. 24, 2010, to present.)

Given those failings, the instant Motion is denied pursuant to the Court's Local Rules. See M.D.N.C. LR7.3(a) ("All motions,

<hr />

[20](...continued)
. . . ." Cullen, ___ U.S. at ___, 131 S. Ct. at 1401. Most notably, that provision severely limits the consideration of new evidence where a petitioner "failed to develop the factual basis of a claim in State court proceedings," 28 U.S.C. § 2254(e)(2), i.e., where a petitioner exhibited a "lack of diligence, or some greater fault," Williams v. Taylor, 529 U.S. 420, 432 (2000). This standard "ensure[s] that federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Cullen, ___ U.S. at ___, 131 S.Ct. at 1401 (internal brackets and quotation marks omitted).

unless made during a hearing or at trial shall be in writing and shall be accompanied by a brief except as provided in section (j) of this rule."), (j) (omitting motions seeking leave to conduct discovery from list of motions that do not require briefs and mandating that even motions exempted from brief requirement "must state good cause" for any requested relief), and (k) ("A motion unaccompanied by a required brief may, in the discretion of the Court, be summarily denied."); see also M.D.N.C. LR7.2(a)(4) (requiring briefs to contain "argument"). Alternatively, the instant Motion is denied for failure to show good cause as required by Habeas Rule 6 (particularly as viewed in light of Cullen). See, e.g., Sears v. White, No. 5:12HC2066F, 2013 WL 1209624, at *5 (E.D.N.C. Mar. 25, 2013) (unpublished) ("[T]he court may not consider phone records which were not before the state courts in determining whether the state courts' decisions denying petitioner's claims were contrary to or an unreasonable application of Supreme Court precedent. Cullen, [___ U.S. at ___,] 131 S.Ct. at 1401. As such, petitioner cannot show good cause for the discovery of such records at this time.").[21]

## V.  CONCLUSION

Petitioner's habeas claims all fail as a matter of law.

**IT IS THEREFORE ORDERED** that Petitioner's Request for Leave to Conduct Discovery (Docket Entry 12) is **DENIED** and Petitioner's

---

[21] A magistrate judge may enter an order on discovery matters in habeas cases (as in other civil cases). See, e.g., Osband v. Woodford, 290 F.3d 1036, 1041 (9th Cir. 2002); Partee v. Stegall, 8 F. App'x 466, 468 (6th Cir. 2001).

Motion for Expedition on the Pleadings (Docket Entry 34) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that the Clerk shall refer Petitioner's Motion for Consolidation of Defenses (Docket Entry 29) to the assigned United States District Judge, as an Objection to the Text Order dated August 1, 2012.

**IT IS RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 5) be granted, that Petitioner's Motion for Partial Summary Judgment (Docket Entry 15) and Motion for Judgment on the Pleadings (Docket Entry 31) be denied, that the Petition (Docket Entry 1) be denied, and that Judgment be entered dismissing this action without issuance of a certificate of appealability.

/s/ L. Patrick Auld
**L. Patrick Auld
United States Magistrate Judge**

June 11, 2014